**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JOHN WEIDENAAR and STACY L. COPE, EXECUTRIX OF THE JAN L. KING ESTATE, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; NUTRIEN LTD.; NUTRIEN AG SOLUTIONS, INC.; THE MOSAIC CO.; CANPOTEX LTD.; CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES INC.; CF NITROGEN, LLC; YARA INTERNATIONAL ASA; and YARA NORTH AMERICA, INC.<br><br>Defendants. | Case No. [_____________]<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

# I. INTRODUCTION

1. This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize prices for nitrogen, phosphate and potassium (potash) fertilizers ("NPK Fertilizers") from at least as early as January 1, 2021, until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Class Period").

2. Defendants are the dominant producers and sellers of NPK Fertilizers in the United States: Koch Fertilizer, LLC and Koch Agronomic Services, LLC (collectively, "Koch"); Nutrien Ltd. and Nutrien Ag Solutions, Inc. (collectively, "Nutrien"); The Mosaic Company ("Mosaic"); Canpotex Ltd. ("Canpotex"); CF Industries Holdings, Inc., CF Industries Inc., and CF Industries Nitrogen, LLC (collectively, "CF Industries"); and Yara International ASA and Yara North America, Inc. (collectively, "Yara").

3. Among the victims of the conspiracy are indirect and direct purchasers of NPK Fertilizers from Defendants, including individual farmers/growers, agricultural cooperatives and retailers, fertilizer mixers, members of farming associations, farm and planting partnerships/company.

4. The U.S. fertilizer industry is one of the most concentrated in the American economy. Defendants (a handful of companies) control the overwhelming majority of domestic production capacity for each of the three primary plant nutrients. In nitrogen, CF Industries, Nutrien, Koch, and Yara collectively control approximately 82% of domestic production capacity, producing a market with a Herfindahl-Hirschman Index ("HHI") in the United States of approximately 2,382. In phosphate, Mosaic and Nutrien together control approximately 91% of domestic production capacity, yielding an HHI of approximately 4,553. In potash, Mosaic and Nutrien—operating through their jointly owned export vehicle, Canpotex—control approximately 90% of the North American supply, with an HHI of approximately 3,455. Each of these HHI

figures show concentration levels that are well above the threshold at which the Department of Justice and the Federal Trade Commission presume a market to be "highly concentrated."

5. Using their market dominance, Defendants charged artificially inflated prices for NPK Fertilizers. The parallel nature of Defendants' pricing across all three NPK markets is striking. Defendants' public pricing disclosures and government data show a strong parallel pattern across nitrogen, phosphate, and potash: a sharp, synchronized increase in 2021 to 2022, a coordinated partial decline in 2023, and renewed parallel increases beginning in 2024 and continuing through the present. This lockstep pricing occurred across markets with different supply-demand fundamentals, different input cost structures, and different competitive conditions—a pattern that is inconsistent with independent competitive behavior but consistent with coordinated action. Further, Defendants had ample opportunity and motive to conspire through overlapping industry associations, conferences, and direct commercial relationships.

6. The United States Department of Justice has now opened an antitrust probe targeting CF Industries, Nutrien, Mosaic, Koch, and Yara—all of the Defendants named here—examining whether these companies colluded to raise fertilizer prices. The DOJ investigation follows a series of escalating government actions reflecting bipartisan concern over fertilizer market concentration and pricing.

7. On September 26, 2025, USDA and the DOJ signed a Memorandum of Understanding committing both agencies to protect American farmers from the burdens imposed by high and volatile input costs, including fertilizer. On December 6, 2025, President Trump signed an Executive Order directing the Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force to investigate price fixing and anti-competitive practices across the food sector, with the fertilizer industry specifically

identified as vulnerable to anti-competitive manipulation. In January 2026, USDA Deputy Secretary Stephen Vaden publicly accused Nutrien and Mosaic of operating a "duopoly" in phosphate and potash, stating that the companies have been "constraining supply and driving up the price that farmers pay" and that the administration "is going to do everything it can" to ensure affordable fertilizer for American farmers.[1] On March 10, 2026, leaders from fourteen state corn grower associations—including Kansas—sent a joint letter to USDA Secretary Rollins and Attorney General Bondi calling for immediate action.[2] The letter reported that DAP, MAP, and potash fertilizers prices had increased drastically over the past year and that "the cost-income squeeze on American farmers has intensified."[3]

8. To provide a remedy for the injury suffered as a result of Defendants' conspiracy and illegal actions, Plaintiffs brings this case on behalf of indirect purchasers of NPK Fertilizers against Defendants for violations of Section 1 of the Sherman Act, state antitrust and consumer protection laws, and under common law for unjust enrichment. Plaintiffs seeks damages, injunctive relief, disgorgement of illegally-obtained profits and the costs of pursuit of this action, including reasonable attorneys' fees, for the injuries that Plaintiffs and Class Members sustained as a result of the Defendants' conspiracy to fix, raise, maintain and/or stabilize the price, and limit, reduce and otherwise manipulate the supply, of NPK Fertilizers.

---

[1] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), at 45:30–46:19; 46:40–47:19; 47:20–47:32, recording available at https://nationalaglawcenter.org/webinars/vaden/.

[2] Multi-State Corn Growers Ass'ns, Jt. Letter to the Honorable Pamela Bondi and the Honorable Brooke Rollins (March 10, 2026), available at https://kscorn.com/wp-content/uploads/2026/03/FertJointLetterCommsToolkit_031026.pdf.

[3] *Id.* at 1.

## II. JURISDICTION AND VENUE

9. Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 for injunctive relief, including reasonable attorneys' fees and costs of this litigation, for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs also brings this action pursuant to state antitrust and consumer protection laws for damages, the common law of unjust enrichment, for disgorgement of illegally-obtained profits, and, where available by law, reasonable attorneys' fees and costs of this litigation.

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

11. This Court has supplemental subject matter jurisdiction over the pendent state antitrust and consumer protection law claims under 28 U.S.C. § 1367 because all their claims arise from the same facts and circumstances and form part of the same case or controversy.

12. The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because (a) there are more than 100 members of the Class; (b) citizenship of at least one proposed Class member is different from that of any Defendant; and (c) matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

13. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this district.

14. This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of NPK Fertilizer throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was

engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Further jurisdictional contacts are alleged below.

## III. PARTIES

15. Within the Class Period, Plaintiffs purchased NPK Fertilizes in the state in which they reside or conduct business and suffered an economic injury as a result of Defendants' illegal conduct described in this Complaint.

### A. Plaintiffs

16. Plaintiff John Weidenaar is a farmer and citizen of Montana, and purchased NPK Fertilizer both directly and indirectly from other Defendants for end use during the Class Period. Plaintiff intends to purchase NPK Fertilizers in the future.

17. Plaintiff Stacy L. Cope is the duly appointed Executrix of the Estate of Jan L. King. The Estate of Jan L. King is a citizen of Colorado. The Estate of Jan L. King owns farmland in Prowers County, Colorado. During the Class Period, the Estate of Jan L. King purchased NPK Fertilizers indirectly from Defendants.

### B. Defendants

#### 1. Koch Fertilizer, LLC

18. Koch Fertilizer, LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is itself a wholly owned subsidiary of Koch Industries. Koch Fertilizer's headquarters are located at 4111 E 37th Street N, Wichita, Kansas, 67220. Koch Fertilizer may be served through its registered agent at 4601 E Douglas Avenue #700, Wichita, Kansas, 67218.

19. Koch Fertilizer and its affiliates are collectively one of the world's largest producers and marketers of fertilizers, including ammonia, urea, UAN, phosphate, potash, and

sulfur-based products.[4] Koch Fertilizer manufactures, markets, and distributes more than 12 million metric tons of fertilizer products annually.[5]

**2. Koch Agronomic Services, LLC**

20. Koch Agronomic Services, LLC (KAS) is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is itself a wholly owned subsidiary of Koch Industries. KAS's headquarters are located at 4111 E 37th Street N, Wichita, Kansas, 67220. KAS may be served through its registered agent at 4601 E Douglas Avenue #700, Wichita, Kansas, 67218. KAS is a leading manufacturer of nitrogen-based NPK Fertilizers throughout the United States.

**3. Nutrien Ltd.**

21. Nutrien Ltd. is a publicly traded company, listed on the New York Stock Exchange (NYSE: NTR), with headquarters located at Suite 1700, 211 19th Street East Saskatoon, Saskatchewan, Canada. Nutrien Ltd. and its subsidiaries and affiliates are the largest upstream fertilizer producer globally.[6] Nutrien's business practices are segmented into Nutrien Ag Solutions ("Retail"), Potash, Nitrogen, and Phosphate.[7]

**4. Nutrien Ag Solutions, Inc.**

22. Nutrien Ag Solutions, Inc. is the retail division, and a wholly owned, operating subsidiary of Nutrien Ltd., with headquarters located at 3005 Rocky Mountain Avenue, Loveland, Colorado 80538. Nutrien Ag Solutions may be served through its registered agent at 112 SW 7th

[4] Koch Ag & Energy Solutions, *Companies: Koch Fertilizer*, available at https://kochagenergy.com/companies.

[5] Koch Fertilizer, *Quality Products. Proven Results*, available at https://kochfertilizer.com/products.

[6] Nutrien, *About us: About Nutrien*, available at https://www.nutrien.com/about.

[7] *See, e.g.,* Nutrien, *Nutrien Report Fourth Quarter and Full-Year 2024 Results* (Feb. 19, 2025) available at https://cdn.sanity.io/files/ixv7nalm/production/674db9d566c2e8807825272bd0d1d6fe2f382a84.pdf.

Street, Suite 3C, Topeka, KS 66603. Nutrien Ag Solutions is one of the largest manufacturers and distributors of nitrogen, phosphate and potash NPK Fertilizers in the United Sates. Nutrien Ag Solutions lists approximately 62 Kansas locations for specific regional customer retail locations.[8]

**5. The Mosaic Company**

23. The Mosaic Company is a publicly traded company, listed on the New York Stock Exchange (NYSE: MOS), with headquarters located at 13830 Circa Crossing Drive, Lithia, Florida 33547. The Mosaic Company is the world's leading integrated producer of concentrated phosphate and potash nutrients for use in NPK Fertilizers.

**6. Canpotex Limited**

24. Canpotex Limited is a private jointly owned export company, equally owned by Nutrien, Ltd. (of which Defendant Nutrien Ag Solutions is a subsidiary) and Mosaic Canada Crop Nutrition, LP (a wholly owned subsidiary of Defendant The Mosaic Company). Canpotex Limited is headquartered at Suite 700, 409 – Third Avenue South, Saskatoon, Saskatchewan, Canada S7K. Canpotex is the world's leading producer of potash minerals used in NPK Fertilizers, and controls over 90% of the potash market.

**7. CF Industries Holdings, Inc.**

25. CF Industries Holdings, Inc. is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF), with headquarters located at 2375 Waterview Drive, Northbrook, Illinois 60062. CF Industries Holdings, Inc. produces nitrogen-based NPK Fertilizers for sale throughout the United States and the United Kingdom.

---

[8] Nutrien Ag Solutions, *Meet Your Crop Consultant: KS*, available at https://nutrienagsolutions.com//find-location.

**8. CF Industries Inc.**

26. CF Industries Inc. is a wholly-owned subsidiary of CF Industries Holdings, Inc. that is incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries Inc. is the primary operating subsidiary of CF Industries Holdings.

**9. CF Nitrogen, LLC**

27. CF Industries owns approximately 89% of CF Industries Nitrogen, LLC; agricultural cooperative, CHS Inc., owns the remainder. CF Industries Nitrogen, LLC is incorporated in Delaware with its principal place of business in Northbrook, Illinois.

**10. Yara International ASA**

28. Yara International ASA is a publicly traded company, listed on the Oslo Stock Exchange (YAR.OL), with headquarters located at Drammensveien 131, 0277 Oslo, Norway. Yara International ASA is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizers.

**11. Yara North America, Inc.**

29. Yara North America, Inc. is wholly owned subsidiary of Yara International ASA. Yara North America's headquarters are located at 100 North Tampa Street, Suite 3800, Tampa, FL 33602. Yara North America may be served through its registered agent at 1100 SW Wanamaker Road, Suite 103, Topeka, KS 66604. Yara North America's main business activities are sales, marketing, or distribution.[9] Yara North America markets a comprehensive offering of crop nutrition services, including a portfolio of nitrogen-based fertilizers and NPKs.[10]

---

[9] Yara Int'l, *Country-By-Country report 2024*, at 14, available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2024/yara-country-by-country-report-2024.pdf.

[10] Yara Int'l, *Yara Integrated Report 2024*, at 233, available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2024/yara-integrated-report-2024.pdf.

### C. Unnamed Co-Conspirators and Other Non-Parties

30. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described: John Does 1-10. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

31. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

32. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Background of NPK Fertilizers

33. Modern agriculture depends heavily on three essential nutrients that plants must have in large quantities: nitrogen (N), phosphorus (P), and potassium (K). These nutrients are supplied to crops through what farmers commonly call nitrogen, phosphate, and potash fertilizers—individually and in combination referred to as NPK Fertilizers (named after the chemical symbols for the nutrients they contain). Together they form the basis of most fertilizer programs around the world.

34. NPK Fertilizers may be applied individually or in blended formulations depending on crop and soil requirements. Farmers sometimes use single-nutrient products when a specific nutrient is needed, but the nutrients can also be combined into blended fertilizers containing nitrogen, phosphorus, and potassium in set proportions. These blends are typically labeled with three numbers indicating the percentage of each nutrient in the product.

35. The United States is one of the world's largest consumers of commercial fertilizers. The U.S. fertilizer market was valued at approximately $29 to 30 billion in 2024–2025 and is projected to grow to approximately $39 billion by 2031.[11] The global fertilizer market was valued at approximately $207 billion in 2024.[12] American farms cultivated more than 220 million acres of cropland in 2023, generating enormous and recurring demand for nitrogen, phosphate, and potash inputs.

36. Fertilizer demand in the United States is driven mainly by the intensive cultivation of row crops—particularly corn and soybeans—which account for the majority of planted acreage and fertilizer consumption. Indeed, corn production alone consumes approximately 45% of all nitrogen fertilizer applied domestically.[13] In 2023, U.S. farmers planted approximately 89.9 million acres of corn.[14] Demand for corn-based ethanol under the Renewable Fuel Standard further intensifies nitrogen fertilizer demand by mandating the conversion of over five billion bushels of corn annually into fuel. Every American farmer who grows corn, soybeans, wheat, or other major crops must purchase nitrogen, phosphate, and potash fertilizers each planting season, making these products a non-discretionary input cost that farmers cannot avoid.

37. NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic

---

[11] Mordor Intelligence, United States Fertilizers Market Size & Share Analysis (2025) (reporting the U.S. fertilizers market at USD 29.93 billion in 2025, forecast to reach USD 39.92 billion by 2031 at a 5.0% CAGR).

[12] Global Market Insights, Fertilizer Market Size, Share, Growth & Forecast Report (2025) (reporting the global fertilizer market at USD 207.2 billion in 2024 and a 2034 forecast of $268.2 billion at a 2.6% CAGR).

[13] Market Data Forecast, U.S. Fertilizers Market Size (Oct. 2025).

[14] USDA, National Agricultural Statistics Service, Acreage Report (June 2023).

fertilizers, NPK Fertilizers provide precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

38. Kansas is the nation's leading wheat-producing state and a top-five corn-producing state, with approximately 46 million acres of farmland and approximately 58,500 farms. Kansas farmers are significant consumers of all three categories of fertilizer products—nitrogen, phosphate, and potash.

**1. Nitrogen Fertilizers**

39. Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key part of chlorophyll, the molecule that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

40. The core feedstock for nitrogen fertilizer production is anhydrous ammonia, which is synthesized through the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used to manufacture a variety of nitrogen fertilizer products.

41. Common nitrogen fertilizers include anhydrous ammonia, urea, ammonium nitrate ("UAN"), ammonium sulfate, and urea ammonium nitrate ("UAN") solution. Anhydrous ammonia, which contains 82 percent nitrogen, is the most concentrated nitrogen fertilizer. Because of its high nitrogen content, it is often the most cost-effective nitrogen fertilizer. Urea Ammonium Nitrate (UAN) solution, produced by combining urea, nitric acid, and ammonia, is a liquid fertilizer product with a nitrogen content that typically ranges from 28 percent to 32 percent. UAN

can be applied more uniformly than non-liquid forms of fertilizer. It can be mixed with herbicides, pesticides, and other nutrients, enabling farmers to reduce costs by applying several materials simultaneously rather than making several separate applications. These fertilizers vary in nitrogen concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

### 2. Phosphate Fertilizers

42. Phosphate fertilizers supply phosphorus, an essential nutrient required for several core plant functions. Phosphorus plays an important role in energy transfer within plant cells, including through molecules such as ATP, and contributes to early plant development, root formation, and the production of flowers and seeds. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

43. Phosphate fertilizers are produced from phosphate rock, a naturally occurring mineral resource mined from geological deposits. After mining, the rock is processed chemically, typically by treatment with acids, to convert the phosphorus into forms that plants can readily absorb. Phosphoric acid is then combined with ammonia to produce the principal finished phosphate fertilizer products: diammonium phosphate ("DAP") and monoammonium phosphate ("MAP"). These fertilizers are generally manufactured as dry granules that can be transported in bulk and applied directly to fields or blended with other nutrients in compound fertilizers.

### 3. Potash Fertilizers

44. Potash fertilizers supply potassium, another primary plant nutrient required for healthy crop growth. Potassium helps regulate water movement within plant tissues, activates enzymes involved in metabolism, and supports plant tolerance to environmental stresses such as drought or disease. Adequate potassium availability can contribute to improved crop quality and resilience.

45. Potash fertilizers are produced from naturally occurring potash ores formed from ancient, evaporated seas. These mineral deposits are mined or extracted from brines and then processed to separate potassium-bearing compounds suitable for agricultural use. The resulting products contain potassium in forms that plants can absorb as potassium ions.

46. The most widely used potash fertilizer is Potassium chloride, also known as muriate of potash ("MOP"), which is the most widely used potash fertilizer. Potassium sulfate, also known as sulfate of potash ("SOP"), is also used, particularly for crops that are sensitive to chloride. Potash fertilizers are typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

**B. Market Concentration for NPK Fertilizers**

47. The Fertilizer industry in the United States has long been characterized by significant consolidation. The NPK Fertilizer industry experienced a drastic consolidation following various market conditions dating back to the 1980s.[15]




[15] *See* Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf ("The fertilizer industry has a historical precedence of extreme consolidation and anti-competitive behaviors…").

48. As a result, today each of the major nutrient industries is dominated by a single corporation: Mosaic reigns over the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the North American potash market as the leading member along with Mosaic.[16] The number of firms in the market has reduced from 46 to 13 since the 1980s, with Defendants now controlling a substantial portion of the market.[17]

49. Given these extraordinary market shares, it is certain that Kansas farmers and agricultural retailers purchase substantial quantities of NPK fertilizers from Defendants.

**1. Defendants control the nitrogen market in the United States**

50. Combined, Koch, CF Industries, Nutrien, and Yara control 82% of the North American fertilizer market for nitrogen:[18]




[16] Nathan Beacom, *Record Prices Give rise to Consolidation Concerns in the Fertilizer Industry*, Offrange (Sept. 23, 2022), available at https://ambrook.com/offrange/supply-chain/record-prices-consolidation-concerns-fertilizer-industry-ukraine-nitrogen.

[17] Noah Zahn, *The cost of growth: Fertilizer companies cash in while farmer and communities struggle*, Investigate Midwest (June 26, 2023), available at https://investigatemidwest.org/2023/06/26/the-cost-of-growth-fertilizer-companies-cash-in-while-farmers-and-communities-struggle/.

[18] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.

51. CF Industries is the largest producer of ammonia in the world.[19] CF then sells ammonia as is or upgrades to other products such as urea, urea ammonium nitrate, and ammonium nitrate.[20]

52. Nutrien publicly states that it is the third-largest nitrogen producer in the world and the #2 North American nitrogen producer, with more than 7 million tonnes of annual gross ammonia nameplate capacity.[21]

53. Koch Fertilizer has substantial major nitrogen production and expansion projects in the United States, including in this District in Dodge City, Kansas.[22]

54. KAS is also directly involved in the commercialization of nitrogen fertilizer products. Koch materials identify ANVOL™, CENTURO™, and SUPERU™ as KAS trademarks, and KAS publicly markets those products as nitrogen-focused inputs intended for use with core nitrogen fertilizers sold in the market.[23] These public representations place KAS squarely within the commercial nitrogen fertilizer ecosystem as an entity actively marketing differentiated nitrogen products and technologies to growers and retailers.

---

[19] CF Industries, *Products*, available at https://www.cfindustries.com/products.
[20] *Id.*
[21] Nutrien, *Our business: Nitrogen*, available at https://www.nutrien.com/about/our-business/nitrogen.
[22] *E.g.,* Koch Fertilizer, *Koch Fertilizer Dodge City Marks 50 Years of Success*, available at https://kochfertilizer.com/newsroom/kf-dodge-city-celebrates-50-years (noting a $150 million investment in the Dodge City site, which produces anhydrous ammonia and UAN fertilizers).
[23] *See* Koch Fertilizer, *Quality Products. Proven Results*, available at https://kochfertilizer.com/products ("ANVOL™, CENTURO™, SUPERU™ and the SUPERU logo are trademarks of Koch Agronomic Services, LLC.").

55. Yara is the world's largest producer nitrogen fertilizers and nitrogen, phosphorus and potassium (NPK) fertilizers.[24] Yara North America's role in the conspiracy is amplified by Yara International's status as the world's largest global producer of nitrogen fertilizers.

56. Public statements show parallel nitrogen fertilizer price increases begin in 2021.

57. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, prices for Nitrogen Fertilizers increased across all forms. Specifically, it reported that ammonia prices increased from approximately $477 per metric ton (1,000 kg) in 2021 to approximately $973 per metric ton in 2022, a 104% increase; urea prices increased from approximately $478 per metric ton to approximately $696 per metric ton, a 46% increase; and prices for nitrates and other Nitrogen Fertilizers increased from $238 per metric ton to approximately $402 per metric ton, a 69% increase.

58. Only a few days later, on February 23, 2023, CF Industries revealed similar year-over-year price increases for its Nitrogen Fertilizers in its 2022 Annual Report. Specifically, it reported that ammonia prices increased from approximately $452 per metric ton in 2021 to approximately $849 per metric ton in 2022, a 88% increase; urea prices increased from approximately $397 per metric ton to approximately $574 per metric ton, a 45% increase; prices for UAN solution increased from $247 per metric ton to approximately $477 per metric ton, a 93% increase; and prices for ammonium nitrate increased from $269 per metric ton to approximately $480 per metric ton, a 78% increase.

---

[24] *See* Int'l Finance Corp., *IFC Project Information and Data Portal: Yara Corporate*, available as https://disclosures.ifc.org/project-detail/ESRS/38320/yara-corporate.

59. Upon information and belief, and based on their own nitrogen fertilizer production capabilities, Defendants Yara International ASA and Yara North America, as well as Koch Fertilizer and KAS made similar price increases across their lines of nitrogen fertilizers.

**2. Defendants control the phosphate market in the United States**

60. With Mosaic controlling a commanding 67% and Nutrien at 24%, two defendants have 91% of the North American phosphate market controlled. [25]




61. Mosaic is the world's largest producer of finished phosphate products, with an annual operational capacity of approximately 16.8 million tonnes of concentrated phosphates—a capacity greater than the next two largest global phosphate producers combined.[26]

62. But in the United States, Mosaic's phosphate dominance is even more extreme. Mosaic produces over 64% of phosphate rock mined in the United States and manufactures 80% of phosphate fertilizers produced in North America. Mosaic has been estimated to control over

---

[25] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wpcontent/uploads/2024/09/Fertilizer_Farm-Action.pdf.
[26] *See* The Mosaic Company, *About: Who We Are*, available at https://mosaicco.com/About.

90% of phosphate-fertilizer sales to U.S. farmers.[27] Together, Mosaic and co-defendant Nutrien represent over 90% of North American phosphate production capacity.[28]

63. Nutrien states that it is the second-largest phosphate producer in North America.[29]

64. Public statements show parallel phosphate fertilizer price increases begin in 2021.

65. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for phosphate fertilizer in North America increased from approximately $602 per metric ton in 2021 to approximately $806 per metric ton in 2022, a 34% increase.

66. On February 22, 2023, Mosaic made a similar announcement. In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for phosphate fertilizer in North America increased from approximately $564 per metric ton in 2021 to approximately $804 per metric ton in 2022, a 43% increase. While Defendants' phosphate fertilizer prices began declining in 2023, the price decreases did not last. In 2025, Defendants Nutrien and Mosaic once again raised prices to similar levels.

67. In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for phosphate fertilizer in North America increased from approximately $615 per metric ton in Q4 2024 to approximately $677 per metric ton in Q4 2025, a 10% increase. Similarly, Mosaic reported on February 24, 2026, that its price for phosphate fertilizer in North America increased from approximately $593 per metric ton in Q4 2024 to approximately $686 per metric ton in Q4 2025, a 16% increase.

---

[27] Farm Action, Agricultural System Concentration Data, at 3 (Aug. 2024), available at https://farmaction.us/concentrationdata/.

[28] *Id.*

[29] Nutrien, *Our business: Phosphate*, available at https://www.nutrien.com/about/our-business/phosphate.

### 3. Defendants control the potash market in the United States

68. Similarly, Nutrien has 55% of the market and Mosaic at 35%, leading to Defendants controlling at least 90% of the North American potash market.[30]




69. Nutrien publicly states that it is "the world's largest soft rock miner and potash producer" and the "#1 global potash producer."[31]

70. Mosaic has approximately 10.4 million tonnes of operational potash capacity, making it a major global potash producer and the second-largest potash producer in North America behind co-defendant Nutrien. In North America, Mosaic accounts for approximately 35% of estimated annual potash production.[32]

71. Together, Mosaic and Nutrien account for roughly 90% of potash production capacity in North America.

---

[30] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.
[31] Nutrien, *Our business: Potash*, available at https://www.nutrien.com/about/our-business/potash.
[32] Fitch Ratings, *Fitch Rates The Mosaic Company's Proposed Senior Unsecured Notes 'BBB'* (Nov. 10, 2025) available at https://www.fitchratings.com/research/corporate-finance/fitch-rates-the-mosaic-company-proposed-senior-unsecured-notes-bbb-10-11-2025.

72. Canpotex—a corporation jointly owned by Nutrien and Mosaic—produces approximately 13 million tonnes of potash annually, using mines owned by Nutrien and Mosaic.[33] The United States is heavily dependent on imported potash. The U.S. Geological Survey reported that U.S. net import reliance for potash was 93 percent of apparent consumption in 2024, and that Canada accounted for 79 percent of U.S. potash imports during 2020–2023.[34]

73. Given that degree of U.S. dependence on Canadian potash, major decisions concerning the routing, timing, and allocation of Saskatchewan potash exports are capable of affecting the overall supply of potash available to North American markets, including the United States. Thus decisions by a principal Saskatchewan export marketer such as Canpotex to direct potash tonnage into offshore channels, delay shipments, maintain port inventories, or commit forward volumes abroad would predictably influence the amount of comparable potash available for sale into or affecting the United States.

74. Public statements show parallel potash fertilizer price increases begin in 2021.

75. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for Potash in North America increased from approximately $317 per metric ton in 2021 to approximately $667 per metric ton in 2022, a 110% increase.

76. On February 22, 2023, Mosaic made a similar announcement. In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for Potash in North America increased from approximately $285 per metric ton in 2021 to approximately $632 per metric ton in 2022, a 122% increase.

---

[33] Canpotex, *Our Markets*, available at https://www.canpotex.com/what-we-do/our-markets/.

[34] *See* USGS, *Mineral Commodity Summaries: Potash*, available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025-potash.pdf.

77. While Defendants' Potash prices began declining in 2023, the price decreases did not last. In 2025, Defendants Nutrien and Mosaic once again raised prices to similar levels.

78. In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for Potash in North America increased from approximately $270 per metric ton in Q4 2024 to approximately $305 per metric ton in Q4 2025, a 13% increase. Similarly, Mosaic reported on February 24, 2026, that its price for Potash in North America increased from approximately $199 per metric ton in Q4 2024 to approximately $264 per metric ton in Q4 2025, a 33% increase.

**4. Input price increases do not explain NPK Fertilizers price increases.**

79. Defendants have repeatedly attributed NPK Fertilizers price increases during the Class Period to general inflation, logistics disruptions, and global supply events, including, but not limited to, the war in Ukraine and the resulting sanctions on exports from Russia and Belarus.

80. But international supply disruptions do not fully explain the persistently high prices. For phosphate fertilizers, for instance, only 2% of fertilizer needs were met through imports in 2022.

81. Regarding potash, following the 2022 invasion of Ukraine, producers of potash outside of sanctioned countries would have been incentivized to increase supply levels in order to take share from their competitors. Without any other restriction on the supply of potash, a continued expansion of supply should have resulted in prices falling back to pre-2022 levels. Yet prices have continued to stay at supracompetitive levels, well above those set out in 2021, throughout this period. Potash producers' refusal to cut their prices constitutes an action which would, absent a conspiracy to increase or stabilize prices, be against their economic self-interest.

82. In December 2025, the United States removed sanctions on Belarusian potash, a major source of supply, in exchange for the release of political prisoners. Still, the reaction in prices of potash was muted, with this reopened supply source failing to bring down prices.

83. Nor do input price increases explain the continually high price of nitrogen fertilizer. Prices remained elevated throughout the Class Period even when natural gas prices were relatively cheap.

84. Indeed, prices across all three fertilizer sources "remain[ed] stubbornly high" throughout the Class Period, "even as commodity markets soften[ed]."[35]

85. On December 8, 2021, the Family Farm Action Alliance sent a letter to the United States Department of Justice, "calling for an investigation into the highly-consolidated fertilizer sector on the suspicion of anti-competitive practices." The letter called out Defendants' unsupported claims of supply issues:

> Claiming a global shortage, fertilizer companies have recently broken records with the ballooning prices they charge for fertilizer. Yet the companies' own documents refute any shortage claims and reveal they have additional capacity they're not utilizing. While it's true that natural gas prices are currently high, Yara's 2021 third quarter report states explicitly that this has had "[l]imited impact on finished fertilizer production to date; Yara is closely monitoring the situation going forward." Nutrien's annual report states that "due to historically low global ammonia prices we curtailed production . . . while maintaining flexibility to respond to improvements in the market condition." Their potash capacity likewise exceeds current production levels, and in 2020 the cash cost to produce potash was $59 per tonne, the lowest level on record for Nutrien.[36]

**C. Government Investigation into Price-Fixing in the Fertilizer Industry**

86. On September 26, 2025, the Department of Justice's Antitrust Division and the USDA signed a memorandum of understanding ("MOU") that formalized a partnership between

---

[35] RealAgriculture, *Sticky input prices and short supplies: What's keeping fertilizer costs high?*, (Aug. 28, 2025), available at https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/.

[36] Letter to DOJ from Joe Maxwell, President of Family Farm Action Alliance (December 8, 2021), available at https://farmaction.us/wp-content/uploads/2021/12/FFAA_DOJ_Fertilizer_Investigation_Final.pdf (citations omitted).

the agencies to protect competition in key agricultural markets, including fertilizer.[37] The MOU emphasized the agencies' commitment to "protecting American farmers from the burdens imposed by high and volatile input costs," including fertilizer.[38] Nutrien further states that its potash business is paired with an extensive midstream distribution network and downstream retail platform, enabling it to produce and distribute potash products efficiently into North American and global markets.[39]

87. On October 28, 2025, President of the Iowa Corn Growers Association ("ICGA"), Mark Mueller, addressed a U.S. Senate Committee Hearing on Competition Issues in the Seed & Fertilizer Industries, telling them that "the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent."[40] Mueller attributed the high fertilizer prices to two decades of unchecked consolidation in the U.S. Fertilizer industry, which left only a few major companies controlling each market segment.[41]

---

[37] Dep't of Justice Office of Public Affairs, *Justice Department and USDA Coordinate to Protect Competition in Agricultural Inputs* (Sept. 29, 2025) available at https://www.justice.gov/opa/pr/justice-department-and-usda-coordinate-protect-competition-agricultural-inputs.

[38] *Memorandum of Understanding Between The Antitrust Division, Department of Justice and the Department of Agriculture Relative To Cooperation with Respect to Strengthening Competition for Agricultural Inputs* (Sept. 26, 2026) available at https://www.justice.gov/atr/media/1415501/dl?inline.

[39] Nutrien, *What we do: Production. Distribution. Retail. Support.*, available at https://www.nutrien.com/.

[40] Testimony of Mark Mueller President of the Iowa Corn Growers Association, U.S. Senate Committee Judiciary Hearing on Competition Issues in the Seed & Fertilizer Industries, (Oct. 28, 2025), available at https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf.

[41] *Id.*

88. According to Mueller, the effects of this market concentration had led to fertilizer costs that far outpaced the price farmers received for their corn.[42] For example, the amount of corn sales required to purchase one unit of monoammonium phosphate (a fertilizer that combines phosphorous and nitrogen) had increased from an average of 136 bushels over the last five years to 230 bushels today, increasing the economic pressure on farmers, as fertilizer prices escalate while crop revenues remain comparatively stagnant.[43]

89. In December 2025, President Donald Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[44]

90. On January 21, 2026, United States Department of Agriculture Deputy Secretary, Stephen Vaden, held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticipative conduct, telling the audience that

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay. It's unacceptable.[45]

---

[42] *Id.*
[43] *Id.*
[44] The White House, *Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain* (Dec. 6, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/.
[45] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), at 46:40-47:19. recording available at https://nationalaglawcenter.org/webinars/vaden/.

News coverage noted that Deputy Secretary Vaden later described Nutrien and Mosaic as having a grip on the fertilizer market as a "duopoly" driving up costs.[46]

91. In February 2026, both the ICGA[47] and the Texas Corn Producers Association[48] sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice is doing to pursue possible antitrust actions against the fertilizer industry. As reported by Progressive Farmer, the letters reflect farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.[49]

92. On March 4, 2026, Bloomberg reported that the DOJ Antitrust Division had opened a formal antitrust investigation into the pricing practices of major Fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices for U.S. farmers.[50] Bloomberg further reported that the investigation is looking at CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International.[51] Those companies are the dominant suppliers of fertilizer products in the United States.[52] Sources told reporters the government inquiry is

---

[46] John Dobberstein, *Feds Scrutinizing Fertilizer Industry, Alleged Mosaic and Nutrien 'Duopoly'*, No-Till Farmer (Jan. 26, 2026), available at https://www.no-tillfarmer.com/articles/14989-feds-scrutinizing-fertilizer-industry-alleged-mosaic-and-nutrien-duopoly.

[47] Iowa Corn Growers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 5, 2026), available at https://x.com/iowa_corn/status/2019456648654315988.

[48] Texas Corn Producers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 10, 2026), available at https://texascorn.org/wp-content/uploads/2026/02/TCPADOJStatusLetter_021026.pdf.

[49] Chris Clayton, *Report: DOJ Looking at Fertilizer Cos.*, Progressive Farmer (Mar. 5, 2026), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press.

[50] Josh Sisco and Ilene Peng, *DOJ Probes US Fertilizer Market for Possible Price Fixing* (Mar. 4, 2026 at 12:26 p.m.), available at https://www.bloomberg.com/news/articles/2026-03-04/doj-probes-us-fertilizer-market-for-possible-price-fixing

[51] *Id.*

[52] Chris Clayton, *Report: DOJ Looking at Fertilizer Cos.*, Progressive Farmer (Mar. 5, 2026), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press.

examining whether coordinated pricing or supply decisions crossed the line into civil or criminal antitrust violations.[53]

**D. Prices for NPK Fertilizers rose during the Class Period and remained elevated despite lower input costs and lower demand.**

93. Before the start of the conspiracy, NPK Fertilizer price increases were typically transitory, and market forces corrected pricing (consistent with a competitive market).

94. NPK Fertilizer prices became significantly elevated during the Class Period as a result of Defendants' conduct. This was contrary to pricing patterns before the Class Period.

95. For example, in 2021, the wholesale fertilizer index increased by over 60% when compared to 2020. The pricing trends continued. In 2022, wholesale fertilizer prices rose dramatically higher, averaging 132% higher than 2020 prices:




96. Across the individual components of NPK Fertilizers, publicly available pricing disclosures show a strong parallel pattern: a sharp increase in 2021 to 2022, price decreases in 2023, and renewed increases beginning in 2024 and continuing through the present:

---

[53] *Id.*

## Nitrogen Fertilizer Producer Price Index for 2016 - 2026




## Phosphate Fertilizer Producer Price Index for 2016 - 2026



**Potash Producer Price Index for 2016 – 2022**[54]




97. Nitrogen prices spiked in 2021-2022. By December 2021, the USDA estimated year-over-year price increases of 235% for anhydrous ammonia, 149% for urea, and 192% for liquid nitrogen (32% UAN):[55]




[54] Data discontinued after 2022.
[55] Angelica Williams and Amy Boline, *Fertilizer prices spike in leading U.S. market in late 2021, just head of 2022 planting season*, USDA – Economic Research Service (Feb. 9, 2022), available at https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=103194.

98. Beginning in mid-2024, fertilizer prices across all three nutrient categories began rising again:[56]




99. These increases cannot be explained by input costs or other macroeconomic factors. In 2021, Nutrien's gross manufacturing profit margin was 669% from 2020, even though its costs of goods sold only increased 58% percent.[57] This dramatic expansion of profits continued into 2022, with Mosaic improving on its 2021 profits by 120%, Nutrien by 142%, and CF by 212%.[58]

100. Indeed, Defendants Nutrien, Mosaic, CF Industries, and Yara continued to reap profits:

---

[56]Faith Parum, *Fertilizer Outlook: Global Risks, Higher Costs, Tighter Margins*, Am. Farm Bureau Fed'n – Market Intel (Sept. 11, 2025), available at https://www.fb.org/market-intel/fertilizer-outlook-global-risks-higher-costs-tighter-margins.

[57] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.

[58] *Id.*




101. The parallel resumption of price increases across all three nutrient markets in 2024–2026—after the 2023 decline—replicates the same synchronized pattern observed during the 2021–2022 spike. This pattern of recurring, synchronized price movements across three chemically distinct product categories is more consistent with coordinated conduct than with independent pricing decisions made by firms responding to different cost structures and supply-demand conditions.

102. In a competitive market, one would expect the prices of these products to be driven by their respective cost structures and supply-demand fundamentals, producing differentiated price trajectories. The tight synchronization of prices across all three markets is anomalous in a competitive setting and is more consistent with coordinated conduct among Defendants who—

uniquely in these markets—participate across multiple nutrient categories and maintain formal and informal mechanisms for the exchange of competitively sensitive information.

**E. The structure and characteristics of the market for NPK Fertilizers support the existence of a conspiracy.**

103. Economic literature makes clear that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

104. Many conditions make the fertilizer industry conducive to cartelization, for individual nutrients and all three nutrients together. These factors include supply-side concentration, standardization of the products, easy explicit and tacit communication between members, high barriers to entry, inelastic demand, and corporate and government control of limited reserves. Observed sustained high profit margins, excess capacity, and the concomitant movement of nitrogen, phosphorus, and potash prices are also consistent with cartel behavior.

**1. Supply-Side Concentration**

105. Defendants are among the largest producers of NPK Fertilizers sold in the United States and together control over 80% of the North American nitrogen fertilizer market[59] and over 90% of the North American phosphate[60] and potash markets.[61] Because the manufacture of NPK

---

[59] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.
[60] *Id.*
[61] *Id.*

Fertilizers is highly concentrated, with the Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.[62]

106. Economists from Texas A&M University's Agricultural and Food Policy Center recently prepared a paper examining fertilizer market conditions. Using the Herfindahl–Hirschman Index, a commonly accepted measure of market concentration,[63] the paper found strong levels of concentration in the fertilizer market:[64]

**Table 2. Herfindahl-Hirschman Index (HHI) measure for Fertilizers by Geographic Scope**

| Geographic Scope | United States | North America | World |
|---|---|---|---|
| Potash | 3,455 | 4,255 | 1,011 |
| Nitrogen | 2,382 | 2,242 | 368 |
| Phosphate | 4,553 | 4,533 | 152 |

Such levels indicate a highly concentrated market, greatly exceed the threshold set by the Department of Justice and FTC in horizontal merger analyses, raises significant competition concerns, and is presumptively susceptible to coordinated anticompetitive conduct.[65]

[62] U.S. Dep't of Justice – Antitrust Division, *Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects* (Oct. 10, 2023), available at https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories.").

[63] U.S. Dep't of Justice – Antitrust Division, *Herfindahl-Hirschman Index*, available at https://www.justice.gov/atr/herfindahl-hirschman-index.

[64] Bart L. Fischer, *et al.*, *Concentration and Competition in the U.S. Fertilizer Industry*, Agricultural and Food Policy Center Texas A&M University (March 2024) available at https://afpc.tamu.edu/research/publications/725/BP-24-1_AFPC-Fertilizer-Markets-May-2024.pdf.

[65] *See* U.S. Department of Justice & FTC, Merger Guidelines § 2.1 n.14 (2023) (Markets in which the HHI is between 1,000 and 1,800 points to be "moderately concentrated" and markets in which the HHI is in excess of 1,800 points to be "highly concentrated.").

107. The paper also summarized the four-firm concentration levels, noting that in the United States, the markets for potash and phosphate were dominated by the top four firms, and 77% of the top four firms controlled the nitrogen fertilizer market in the United States:[66]

**Table 3. Four-firm concentration (CR4) measure for Fertilizers by Geographic Scope**

| Geographic Scope | United States | North America | World |
|---|---|---|---|
| Potash | 100% | 99% | 84% |
| Nitrogen | 77% | 77% | 13% |
| Phosphate | 100% | 100% | 25% |

108. The Texas A&M paper concluded that "Our work found that increases in the cost of natural gas prices explained less than 20% of the increase in fertilizer prices paid by producers in 2022."[67]

### 2. Standardization

109. NPK Fertilizers are standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. This standardization also makes it easier for competing firms to coordinate on a common price structure.[68]

110. NPK Fertilizers are fungible, homogenous commodity products with little differentiation, and one supplier's type is readily substituted for another supplier. As a result, buyers make purchase decisions based largely, if not entirely, on price.

---

[66] *Id.*

[67] Bart L. Fischer, *et al.*, *Concentration and Competition in the U.S. Fertilizer Industry*, Agricultural and Food Policy Center Texas A&M University (March 2024), at 16.

[68] *Id.* ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service").

### 3. Opportunities to collude

111. Collusion also may be facilitated by trade associations.[69] Here, Defendants have had multiple opportunities to collude through trade associations to which they belonged and served as board members. For example, Defendants Canpotex, CF Industries, Koch Agronomic Services, The Mosaic Company, Nutrien Ag Solutions, and Yara are all active members of the International Fertilizer Association ("IFA"),[70] a global fertilizer association, headquartered in Paris, France.[71] Bruce Bohn (CF Industries), Bruce Bodine (The Mosaic Company), Kenneth Seitz (Nutrien), and Svein Tore Holsether (Yara International ASA), are also members of IFA's Board.[72] IFA sponsors a number of recurring in-person trade events including the IFA Annual Conference and the Cultivating Tomorrow Conference.[73]

112. Similarly, CF Industries, Inc, Koch Fertilizer, LLC., The Mosaic Company, Nutrien, and Yara North America, Inc., are all members and Board members, of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia.[74] Besides offering exclusive members-only "market volatility information and resources,"[75] TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.[76]

---

[69] *Id.* ("Collusion is more likely if the competitors know each other well, through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.").
[70] Int'l Fertilizer Ass'n, *Our Members*, available at https://www.fertilizer.org/about-ifa/our-members/.
[71] Int'l Fertilizer Ass'n, *Contact Us*, available at https://www.fertilizer.org/about-ifa/contact-us/.
[72] Int'l Fertilizer Ass'n, *Our Board*, https://www.fertilizer.org/about-ifa/structure-governance/our-board/.
[73] Int'l Fertilizer Ass'n, *Events*, https://www.fertilizer.org/news-events/events/.
[74] The Fertilizer Institute, *Leadership*, https://www.tfi.org/about-us/leadership/.
[75] The Fertilizer Institute, *Market Intelligence Insights*, https://www.tfi.org/insights/market-intelligence-insights/.
[76] The Fertilizer Institute, *Event Calendar*, https://www.tfi.org/events/event-calendar/.

113. All six Defendants are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario.[77] CF Industries, Inc., Koch Fertilizer Canada, ULC, The Mosaic Company, Nutrien, and Yara North America, Inc. are members of the Board of FC.[78] FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.[79]

114. Nutrien Ltd., The Mosaic Company, and Koch Sulfur Products Company L.L.C., are all members[80] and Board members[81] of The Sulfur Institute ("TSI"), a global association for sulfur and sulfuric acid professionals, based in Washington, D.C.[82] TSI sponsors a number of in-person trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting.[83] Sulfur is used to processing phosphate rock into phosphate fertilizers.[84]

115. Both David Bilby (CF Industries) and Shawn McGreevy (Koch Fertilizer LLC), are Board members of the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group.[85] Gary Vogen (Yara North America, Inc.), previously served as a Board member of FIRT.[86] FIRT hosts an annual meeting, in partnership with TFI.[87]

---

[77] Fertilizer Canada, *About*, https://fertilizercanada.ca/about/.
[78] *Id.*
[79] *Id.*
[80] The Sulfur Institute, *About TSI: Member Companies*, https://www.sulphurinstitute.org/about-tsi/member-companies/.
[81] The Sulfur Institute, *About TSI: Board of Directors*, https://www.sulphurinstitute.org/about-tsi/board-of-directors/.
[82] The Sulfur Institute, *About TSI: Mission and Programs*, https://www.sulphurinstitute.org/about-tsi/mission-and-programs/.
[83] The Sulfur Institute, *Events: TSI Meetings and Events*, https://www.sulphurinstitute.org/events/tsi-meetings-and-events/.
[84] USGS, *Fertilizers—Sustaining Global Food Supplies*, available at https://pubs.usgs.gov/fs/fs155-99/fs155-99.pdf.
[85] Fertilizer Industry Round Table, *About: Current Board*, http://www.firt.org/about/current-board.
[86] Fertilizer Industry Round Table, *About: Past Members*, http://www.firt.org/about/past-member.
[87] Fertilizer Industry Round Table, *About*, http://www.firt.org/about.

116. Both Koch Agronomic Services, LLC and The Mosaic Company are members of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia.[88] Additionally, Nathan Packer (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company), are members of the Board of ARA.[89] ARA hosts a number of recurring in-person events, including the Annual ARA Conference and Expo,[90] in addition to semi-annual in-person meetings of ARA committees.[91]

**4. High Barriers to Entry**

117. There are also high barriers to becoming a manufacturer of NPK Fertilizers. Economic authorities recognize that structural features such as high barriers to entry, homogeneous products, transparency, and vertical integration make cartelization more plausible and more sustainable by reducing the likelihood that new competitors will enter and disrupt supracompetitive pricing.[92] A large capital investment is required to enter the NPK Fertilizer industry, as companies wishing to enter must purchase machines and operating space to manufacture NPK Fertilizers.

118. For example, nitrogen fertilizers require the energy-intensive Haber-Bosch process to create ammonia and further specialized facilities and equipment for the refinement of ammonia

[88] Agricultural Retailers Ass'n, *ARA Members*, https://www.aradc.org/members.
[89] Agricultural Retailers Ass'n, *ARA Board of Directors*, https://www.aradc.org/board.
[90] Agricultural Retailers Ass'n, *Amplify ag retail at the 2026 ARA Conference and Expo in Austin, Texas*, https://www.aradc.org/2026-conference-expo.
[91] Agricultural Retailers Ass'n, *ARA Committees*, https://www.aradc.org/get-involved.
[92] Organisation for Economic Co-Operation and Development, *Use of Economic Evidence in Cartel Cases* (Dec. 8, 2023) available at https://one.oecd.org/document/DAF/COMP/GF%282023%295/en/pdf.

into UAN or urea is needed.[93] Similar constraints exist for both phosphate[94] and potash.[95] And the importance of research and development in the industry also may deter new entrants.[96]

119. Potential entrants to the industry also must make a significant financial investment to acquire, maintain and update production facilities and equipment. Larger players have an advantage because they are able to build or acquire multiple manufacturing facilities, discouraging others from entering. Thus, the start-up capital necessary to compete with today's NPK Fertilizer manufacturers would be substantial. NPK Fertilizer manufacturers have significant economies of scale, utilizing large and expensive production facilities. Barriers to entry in NPK Fertilizer manufacturing both prevent new competitors from entering the market and make the market susceptible to collusion. The NPK Fertilizer market exhibits the classic structural conditions under which collusion is more plausible and more durable: concentrated production, high fixed costs, dependence on scarce or geographically concentrated inputs, technically complex production processes, and substantial regulatory and logistical barriers that deter timely entry or expansion.

---

[93] Sarah Sellars, *Synthetic Nitrogren Fertilizer in the U.S.*, Farmdoc Dailey (Feb. 17, 2021) available at https://farmdocdaily.illinois.edu/2021/02/synthetic-nitrogen-fertilizer-in-the-us.html.

[94] Phosphate rock ore—which is used as intermediate feedstocks in the manufacture of granular and liquid ammonium phosphate fertilizers and animal feed supplements—is mined in only a handful of states and by a few companies. *See* U.S. Dep't of the Interior, *Mineral Commodity Summaries 2025*, at 134 (March 2025) available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025.pdf. The byproduct of processing phosphate ore into phosphoric acid for fertilizer production contains radium that then decays into radon gas, and EPA regulations require this byproduct to be carefully managed to limit public exposure. U.S. Env't Prot. Agency, *Phosphogypsum*, available at https://www.epa.gov/radiation/phosphogypsum.

[95] Because fertilizers producers in the United States rely heavily on potash import (with 79% coming from Canada), fertilizer producers depend on a small number of established producing regions and firms. *See* U.S. Dep't of the Interior, *Mineral Commodity Summaries 2025*, at 146–47 (March 2025) available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025.pdf.

[96] *See, e.g.,* Rong Lan *et al.*, *Synthesis of ammonia directly from air and water at ambient temperature and pressure* (discussing use of Haber-Bosch process and requiring specialized facilities capable of producing extreme heat and pressures to synthesize ammonia from nitrogen)

**5. Inelastic Demand**

120. Demand for fertilizer is highly inelastic: farmers must purchase nitrogen, phosphate, and potash each planting season regardless of price, because no substitutes exist for these essential crop nutrients. Industries with inelastic demand, such as the NPK Fertilizers industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

121. A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizers cannot be interchanged freely with other goods—although there are other fertilizers, NPK Fertilizers are unique because they provide precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers.

122. Customers similarly do not view NPK Fertilizers as interchangeable with other fertilizers.

**6. Unconcentrated Demand Side**

123. The unconcentrated nature of the demand side of the NPK Fertilizers market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

**7. Opportunities to Exchange Competitively-Sensitive Information**

124. The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[97] As described above, Defendants Mosaic and Nutrien are members of Canpotex, a

---

[97] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

Canadian export marketing agency through which Defendants collectively sell their Canadian Potash into overseas markets. Canpotex allows Defendants to share a range of competitively sensitive data, including production data, pricing information, and sales volumes. The data Canpotex collects is data which would normally be kept confidential given its competitively sensitive nature. Moreover, Defendants' employees display significant overlaps with that of Canpotex. For example, Nutrien's CEO is the former President and CEO of Canpotex.

**8. Defendants' Recidivist History**

125. Finally, the NPK Fertilizers industry has a history of antitrust scrutiny.

126. In the early 1990s, several Potash producers were the subject of a price-fixing investigation by the Antitrust Division of the United States Department of Justice.

127. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, PotashCorp, and Agrium—coordinated production and sales to keep potash prices artificially high.[98] There, plaintiffs alleged producers shared market information, allocated volumes, and restricted output as part of a "tight-knit global cartel."[99] Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).[100]

## V. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

128. Defendants' anticompetitive conduct had the following effects, among others:

---

[98] Fertilizerworks.com, *Potash Producers Must Face Buyers' U.S. Antitrust Lawsuit* (June 27, 2012), available at https://www.fertilizerworks.com/news/potash-producers-must-face-buyers%E2%80%99-us-antitrust-lawsuit ((discussing *Minn-Chem Inc. v. Agrium Inc.*, No. 10-1712 (7th Cir. 2008)).

[99] Courthouse News Service, *Potash Price-Fixing Conspiracy Alleged* (Sept. 12, 2008), available at https://www.courthousenews.com/potash-price-fixing-conspiracy-alleged/.

[100] PR Newswire, *The Mosaic Company Announces Settlement Of Potash Antitrust Litigation* (Jan. 30, 2013), available at https://www.prnewswire.com/news-releases/the-mosaic-company-announces-settlement-of-potash-antitrust-litigation-189020521.html.

- Competition among Defendants has been restrained or eliminated with respect to NPK fertilizers;
- The price of NPK fertilizers has been fixed, stabilized, or maintained at artificially high levels; and
- Purchasers have been deprived of free and open competition for NPK fertilizers.

129. Defendants' violations of the antitrust laws have caused Plaintiffs and members of the Class to pay higher prices for NPK fertilizers than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs and members of the Class have suffered damages in the form of overcharges paid on their NPK fertilizers purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement is per se unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

130. Research from the American Antitrust Institute has found that the median overcharge imposed by hard-core fertilizer cartel members was approximately 41%, exceeding the 30% median overcharge observed across all industries from 1702 through 2010.[101] These findings underscore that the fertilizer industry has historically been among the most susceptible to anticompetitive coordination, and that consumers of fertilizer products bear disproportionate harm when such coordination occurs.

131. Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. But Plaintiffs defines such market below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

---

[101] C. Robert Taylor and Diana L. Moss, *The Fertilizer Oligopoly: The case for Global Antitrust Enforcement*, 14 n.20 (Sept. 2013), available at https://www.antitrustinstitute.org/wp-content/uploads/2013/10/FertilizerMonograph.pdf.

### A. The Relevant Product Market is NPK fertilizers.

132. To the extent a relevant product market needs to be defined in this action, it is the market for NPK fertilizers.

133. Accordingly, there are no reasonable substitutes for NPK fertilizers, and they are a distinct product market.

134. Additionally, or in the alternative, individual submarkets exist for Nitrogen Fertilizers, Phosphate Fertilizers, and Potash.

### B. The Relevant Geographic Market is the United States.

135. Should a geographic market need to be defined in this action, it is the United States. Defendants produce and distribute NPK fertilizers through locations across the United States and have increased NPK fertilizers prices nationwide.

## VI. STATUTE OF LIMITATIONS AND TOLLING

136. Plaintiffs and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged until shortly before filing this action.

137. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the Class.

138. Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2026, when news of the DOJ's investigation into NPK fertilizers prices broke.

139. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

## VII. CLASS ACTION ALLEGATIONS

140. Plaintiffs repeats and re-alleges every allegation above as set forth above.

141. **Nationwide Class:** Pursuant to Federal Rule 23(b)(1) and (2) and seeking equitable and injunctive relief, Plaintiffs brings this suit on their behalf and on behalf of a proposed class of all other similarly situated persons consisting of:

> All persons and entities who purchased NPK fertilizers indirectly from one or more Defendant, or from any division, subsidiary, predecessor, agent, or affiliate of such Defendants, at any time during the period of January 1, 2021 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Nationwide Class").

142. Excluded from the Class are:

a. Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

b. The judges in this case and any members of their immediate families and judicial staff;

c. Any juror assigned to this action;

d. All governmental entities;

e. All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and

f. All persons who are currently incarcerated.

143. **State Law Damages Class**: Pursuant to Federal Rule 23(b)(3) and seeking damages pursuant to state antitrust and consumer protection laws, as well as common law unjust enrichment, Plaintiffs brings this suit on their behalf and on behalf of a proposed class of all other similarly situated persons consisting of:

> All persons and entities in Indirect Purchaser States[102] who purchased NPK fertilizers indirectly from one or more Defendant, or from any division, subsidiary, predecessor, agent, or affiliate of such Defendants, at any time during the period of January 1, 2021 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "State Law Damages Class").

144. Excluded from the Class are:

a. Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

b. The judges in this case and any members of their immediate families and judicial staff;

c. Any juror assigned to this action;

d. All governmental entities;

e. All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and

f. All persons who are currently incarcerated.

145. ***Numerosity***. The Classes consist of hundreds of thousands of members residing throughout the United States. Numerosity is therefore satisfied, and it would be impracticable to join all Class Members before the Court.

146. ***Commonality***. Under Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all the members of the Classes and which predominate over any individual issues. Included within the common question of law or fact are:

a. The definition of the relevant product market;

b. Defendants' market power within the relevant product market;

c. Whether Defendants exchanged competitively sensitive information;

---

[102] The Indirect Purchaser States include Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

d. Whether Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize prices for NPK Fertilizer;

e. The duration of the conspiracy alleged and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;

f. Whether such combination or conspiracy violated the federal antitrust laws;

g. Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and other members of the Class;

h. Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on NPK Fertilizer;

i. The appropriate class-wide measure of damages; and

j. The nature of appropriate injunctive relief to restore competition in the NPK Fertilizer market.

147. Plaintiff's claims are typical of the claims of the respective members of the Classes, in that he shares the above-referenced facts and legal claims or questions with the members of the Classes, there is a sufficient relationship between the damage to Plaintiffs and Defendant's conduct affecting Class Members, and Plaintiffs has no interests adverse to the interests of other members of the Classes.

148. Plaintiffs will fairly and adequately protect the interests of members of the Classes and has retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in antitrust litigation.

149. A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable and no other group method of adjudication of all claims asserted is more efficient and manageable for at least the following reasons:

a. The liability claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

b. Absent certification of the Class, members of the Classes will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

c. Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d. When the liability of Defendant has been adjudicated, claims of all members of the Classes can be administered efficiently and/or determined uniformly by the Court; and

e. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and members of the Classes can seek redress for the harm caused to them by Defendants.

150. Because Plaintiffs seeks relief for the entire Classes, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.

151. Further, bringing individual claims would overburden the courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual members of the Classes would, as a practical matter, be dispositive of the interest of other members of the Classes who are not parties to the adjudication and may impair or impede their ability to protect their interests. Consequently, class treatment is a superior method for adjudication of the issues in this case.

## VIII. CLAIMS FOR RELIEF

### Count 1: Price Fixing in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) (On behalf of Nationwide Class for Injunctive Relief)

152. Plaintiffs repeat and re-allege every allegation above as set forth above.

153. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

154. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of NPK Fertilizer and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

155. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on NPK Fertilizer.

156. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among Defendants has been restrained or eliminated with respect to NPK Fertilizer prices;
- The prices of NPK Fertilizer have been fixed, stabilized, or maintained at artificially high levels; and
- Plaintiffs and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

157. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is

anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

158. Plaintiffs and members of the Classes are entitled to an injunction against Defendants to end the ongoing violations alleged.

## VIOLATIONS OF STATE ANTITRUST LAWS

159. Plaintiffs repeats and re-alleges every allegation above as set forth above.

160. The following Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the State Law Damages Class.

161. Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

### Count 2: Violation of Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

162. Plaintiffs repeat and re-allege every allegation above as set forth above.

163. By reason of the conduct alleged, Defendant has violated ARIZONA REV. STAT. § 44-1401, *et seq.*

164. Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

165. Under Arizona law, "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by

any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." ARIZ. REV. STAT. § 44-1403.

166. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the NPK Fertilizer market, a substantial part of which occurred within Arizona.

167. Defendants' violations of Arizona law were flagrant.

168. Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

169. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

170. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under Arizona Revised Statutes Section 44-1401, *et seq*.

171. In conjunction with the filing of this Complaint, Plaintiffs will serve a copy of this Complaint on the Arizona Attorney General in accordance with ARIZ. REV. STAT. ANN. § 44-1415(A).

**Count 3: Violation of California's Cartwright Act,**
**Cal. Bus. & Prof. Code § 16700 *et seq.***

172. Plaintiffs repeat and re-allege every allegation above as set forth above.

173. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

174. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. CAL. BUS. & PROF. CODE § 301.

175. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

176. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

177. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the NPK Fertilizer market, a substantial part of which occurred within California.

178. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq*.

179. Members of the Class purchased NPK Fertilizer within the State of California during the Class Period. But for Defendant's conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

180. Plaintiffs and Class Members with respect to purchases of NPK Fertilizer California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**Count 4: Violation of Colorado Antitrust Act,**
**Colo. Rev. Stat. Ann. § 6-4-101, *et seq.***

181. Plaintiffs repeat and re-allege every allegation above as set forth above.

182. Plaintiffs and Class Members purchased Defendants' NPK Fertilizer within Colorado during the Class Period. But for Defendants' conduct set forth, the price of Defendants' NPK Fertilizer would have been lower, in an amount to be determined at trial.

183. The Colorado State Antitrust Act of 2023 specifically allows a private act of recovery for "[a]ny person injured, either directly or indirectly" from violations Colorado antitrust law for actual damages. *See* C.R.S. § 6-4-115 (emphasis added).

184. Defendants contracted, combined or conspired to act in restraint of trade within Colorado in violation of C.R.S. § 6-4-101, *et seq*.

185. Members of the Class were injured with respect to purchases of NPK Fertilizer in Colorado and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs. C.R.S. § 6-4-115.

**Count 5: Violation of Connecticut Antitrust Act,**
**Colo. Gen. Stat. Ann. § 35-24, *et seq.***

186. Plaintiffs repeat and re-allege every allegation above as set forth above.

187. Members of the Class purchased Defendants' NPK Fertilizer within Connecticut during the Class Period. But for Defendants' conduct set forth, the price of Defendants' NPK Fertilizer would have been lower, in an amount to be determined at trial.

188. The Connecticut Antitrust Act specifically allows a private act of recovery for indirect purchasers by prohibiting a defendant from "assert[ing] a defense that the defendant did not deal directly with the person on whose behalf the action is brought." *See* C.G.S.A. § 35-46a.

189. Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation C.G.S.A. § 35-24, *et seq*. Defendants' conducts and conspiracies restrained, suppressed, and eliminated the price competitive for NPK Fertilizer; artificially increased the demand for NPK Fertilizer, while depriving Plaintiffs and Class Members of free and open competition. These acts resulted in Plaintiffs and Class Members paying supracompetitive, artificially inflated prices for NPK Fertilizer.

190. Members of the Class were injured with respect to purchases of NPK Fertilizer in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**Count 6: Violation of District of Columbia Antitrust Act,**
**D.C. Code § 28-4501, *et seq.***

191. Plaintiffs repeat and re-allege every allegation above as set forth above.

192. Members of the Class purchased Defendants' NPK Fertilizer within the District of Columbia during the Class Period. But for Defendants' conduct set forth, the price of Defendants' NPK Fertilizer would have been lower, in an amount to be determined at trial.

193. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

194. Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia in violation of D.C. CODE § 28-4501, *et seq*.

195. Members of the Class were injured with respect to purchases of NPK Fertilizer in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**Count 7: Violation of Hawaii Antitrust Act,**
**Haw. Rev. Stat. Ann. § 480-1, *et seq.***

196. Plaintiffs repeat and re-allege every allegation above as set forth above.

197. Members of the Class purchased NPK Fertilizer within Hawaii during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

198. The Hawaii Antitrust Act specifically allows a private act of recovery for indirect purchasers. *See* HRS § 480-13.3.

199. Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation of H.S.R. § 480-1, *et seq*.

200. Members of the Class were injured with respect to purchases of NPK Fertilizer in Hawaii and are entitled to all forms of relief, including actual damages, as well as interest and reasonable attorneys' fees and costs.

**Count 8: Violation of Illinois Antitrust Act,**
**740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.***

201. Plaintiffs repeat and re-allege every allegation above as set forth above.

202. Members of the Class purchased Defendants' NPK Fertilizer within the State of Illinois during the Class Period. But for Defendants' conduct set forth, the price of Defendants' NPK Fertilizer would have been lower, in an amount to be determined at trial.

203. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN.10/7(2).

204. Defendants entered into contracts or engaged in a combination or conspiracy to artificially increase the demand for NPK Fertilizer sold within the State of Illinois.

205. Members of the Class were injured with respect to purchases of NPK Fertilizer in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**Count 9: Violation of Iowa Competition Law,**
**Iowa Code § 553.1, *et seq.***

206. Plaintiffs repeat and re-allege every allegation above as set forth above.

207. Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

208. Members of the Class purchased Defendants' NPK Fertilizer within the State of Iowa during the Class Period. But for Defendants' conduct set forth, the price of Defendants' NPK Fertilizer would have been lower, in an amount to be determined at trial.

209. Defendants contracted, combined or conspired to restrain trade in the NPK Fertilizer market, in violation of IOWA CODE § 553.1, *et seq*.

210. Members of the Class were injured with respect to purchases of NPK Fertilizer in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**Count 10: Violation of Kansas Restraint of Trade Act,**
**Kan. Stat. Ann. § 50-101, *et seq.***

211. Plaintiffs repeat and re-allege every allegation above as set forth above.

212. The Kansas Restraint of Trade Act aims to prohibit practices which, among other things, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

213. Members of the Class purchased NPK Fertilizer within the State of Kansas during the Class Period.

214. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

215. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

216. Members of the Class were injured with respect to purchases of NPK Fertilizer in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**Count 11: Violation of Maine's Antitrust Statute,**
**Me. Rev. Stat. Ann. Tit. 10 § 1101, *et seq.***

217. Plaintiffs repeat and re-allege every allegation above as set forth above.

218. Members of the Class purchased NPK Fertilizer within the State of Maine during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

219. Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

220. Members of the Class were injured with respect to purchases of NPK Fertilizer in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**Count 12: Violation of Maryland's Antitrust Statute,**
**Md. Code Ann. § 11-204(A), *et seq.***

221. Plaintiffs repeat and re-allege every allegation above as set forth above.

222. The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

223. Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE ANN. § 11-209(b)(2)(i).

224. Under Maryland's antitrust statute, a plaintiffs who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. MD. CODE ANN. § 209(b)(4).

225. Members of the Class were injured with respect to purchases of NPK Fertilizer in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**Count 13: Violation of the Michigan Antitrust Reform Act,
Mich. Comp. Laws § 445.771, *et seq.***

226. Plaintiffs repeat and re-allege every allegation above as set forth above.

227. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq.*).

228. Members of the Class purchased Defendants' NPK Fertilizer within the State of Michigan during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

229. Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS § 445.778(2).

230. Members of the Class were injured with respect to purchases of NPK Fertilizer in Michigan and are entitled to all forms of relief, including actual damages, treble damages for

flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**Count 14: Violation of the Minnesota Antitrust Law,**
**Minn. Stat. § 325D.49 *et seq.* & 325D.57 *et seq.***

231. Plaintiffs repeat and re-allege every allegation above as set forth above.

232. The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into . . . whenever any of the forgoing affects the trade or commerce of [Minnesota]." MINN. STAT. § 325D.54.

233. Members of the Class purchased Defendants' NPK Fertilizer in the State of Minnesota during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

234. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. § 325D.57.

235. Members of the Class were injured with respect to purchases of NPK Fertilizer in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**Count 15: Violation of the Mississippi Antitrust Statute,**
**Miss. Code Ann. § 75-21-1, *et seq.***

236. Plaintiffs repeat and re-allege every allegation above as set forth above.

237. Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with

the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

238. "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, among other things, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

239. Members of the Class purchased NPK Fertilizer within the State of Mississippi during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

240. Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

241. Members of the Class were injured with respect to purchases of NPK Fertilizer in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**Count 16: Violation of the Nebraska Junkin Act,**
**Neb. Rev. Stat. § 59-801, *et seq.***

242. Plaintiffs repeat and re-allege every allegation above as set forth above.

243. The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

244. The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include,

among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060.

245. Members of the Class purchased NPK Fertilizer within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

246. Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

247. Members of the Class were injured with respect to purchases of NPK Fertilizer in Nevada in that at least thousands of sales of NPK Fertilizer took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

248. Accordingly, Plaintiffs and Class Members are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count 17: Violation of the Nevada Unfair Trade Practices Act,**
**Nev. Rev. Stat. § 598A.010, *et seq.***

249. Plaintiffs repeat and re-allege every allegation above as set forth above.

250. The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

251. The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060.

252. Members of the Class purchased NPK Fertilizer within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

253. Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

254. Members of the Class were injured with respect to purchases of NPK Fertilizer in Nevada in that at least thousands of sales of NPK Fertilizer took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

255. Accordingly, Members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count 18: Violation of New Hampshire's Antitrust Statute,**
**N.H. Rev. Stat. Ann. Tit. XXXI, § 356, *et seq.***

256. Plaintiffs repeat and re-allege every allegation above as set forth above.

257. Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

258. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

259. Members of the Class purchased Defendants' NPK Fertilizer within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth, the price of Defendants' NPK Fertilizer would have been lower, in an amount to be determined at trial.

260. Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II). Defendants established, maintained or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of in violation of N.H. REV. STAT. ANN. § 356:1, *et seq*.

261. Members of the Class were injured with respect to purchases of Defendants' NPK Fertilizer in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**Count 19: Violation of the New Mexico Antitrust Act,**
**N.M. Stat. Ann. § 57-1-1, *et seq.***

262. Plaintiffs repeat and re-allege every allegation above as set forth above.

263. The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

264. Members of the Class purchased NPK Fertilizer within the State of New Mexico during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

265. Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

266. Members of the Class were injured with respect to purchases of NPK Fertilizer in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count 20: Violation of Section 340 of the New York General Business Law,**
**N.Y. Gen. Bus. Law § 340, *et seq.***

267. Plaintiffs repeat and re-allege every allegation above as set forth above.

268. Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

269. Members of the Class purchased NPK Fertilizer within the State of New York during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

270. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

271. Members of the Class were injured with respect to purchases of NPK Fertilizer in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW §349, *et seq*.

**Count 21: Violation of the North Carolina General Statutes, N.C. Gen. Stat. § 75-1, *et seq.***

272. Plaintiffs repeat and re-allege every allegation above as set forth above.

273. Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

274. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

275. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

276. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

277. Because of the foregoing, Members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. GEN. STAT. § 75-1, *et seq*.

**Count 22: Violation of the North Dakota Uniform State Antitrust Act,**
**N.D. Cent. Code § 51-08.1-01, *et seq.***

278. Plaintiffs repeat and re-allege every allegation above as set forth above.

279. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE § 51-08.1-01, *et seq*.

280. Members of the Class purchased NPK Fertilizer within the State of North Dakota during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

281. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE § 51-08.1-08.

282. Defendants' violations of North Dakota law were flagrant.

283. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

284. As a direct and proximate cause of Defendants' unlawful conduct, Members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. CENT. CODE § 51-08.1-01, *et seq.*

**Count 23: Violation of the Oregon Antitrust Law,**
**Or. Rev. Stat. § 646.705, *et seq.***

285. Plaintiffs repeat and re-allege every allegation above as set forth above.

286. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the

policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

287. Members of the Class purchased NPK Fertilizer within the State of Oregon during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

288. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

289. Members of the Class were injured with respect to purchases of NPK Fertilizer within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**Count 24: Violation of the Rhode Island Antitrust Act,**
**6 R.I. Gen. Laws § 6-36-1, *et seq.***

290. Plaintiffs repeat and re-allege every allegation above as set forth above.

291. The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

292. Members of the Class purchased NPK Fertilizer within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

293. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

294. Members of the Class were injured with respect to purchases of NPK Fertilizer in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**Count 25: Violation of the South Dakota Antitrust Statute,**
**S.D. Codified Laws § 37-1-3.1, *et seq.***

295. Plaintiffs repeat and re-allege every allegation above as set forth above.

296. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

297. Members of the Class purchased NPK Fertilizer within the State of South Dakota during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

298. Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

299. Members of the Class were injured with respect to purchases of NPK Fertilizer in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**Count 26: Violation of the Tennessee Trade Practices Act,**
**Tenn. Code § 47-25-101, *et seq.***

300. Plaintiffs repeat and re-allege every allegation above as set forth above.

301. The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, among other things, all arrangements, contracts, agreements, or

combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE ANN. § 47-25-101.

302. Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

303. Defendants competed unfairly and colluded by meeting to restrain output, artificially increase demand, divide markets, and otherwise restrain trade as set forth, in violation of TENN. CODE ANN. § 47-25-101, *et seq*.

304. Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for NPK Fertilizer was restrained, suppressed, and eliminated throughout Tennessee; (2) artificially increase the demand for NPK Fertilizer throughout Tennessee; (3) Plaintiffs and Class Members were deprived of free and open competition; and (4) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for NPK Fertilizer.

305. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as NPK Fertilizer refined from Defendants NPK Fertilizer was sold in Tennessee.

306. Members of the Class purchased NPK Fertilizer within the State of Tennessee during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

307. Members of the Class were injured with respect to purchases of NPK Fertilizer in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**Count 27: Violation of the Utah Antitrust Act,**
**Utah Code Ann. § 76-10-3101, *et seq.***

308. Plaintiffs repeat and re-allege every allegation above as set forth above.

309. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

310. Members of the Class purchased NPK Fertilizer within the State of Utah during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

311. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

312. Members of the Class were injured with respect to purchases of NPK Fertilizer in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

**Count 28: Violation of the West Virginia Antitrust Act,**
**W. Va. Code § 47-18-1, *et seq.***

313. Plaintiffs repeat and re-allege every allegation above as set forth above.

314. The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

315. During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

316. Members of the Class purchased Defendants' NPK Fertilizer within the State of West Virginia during the Class Period. But for Defendant's conduct set forth, the price of Defendants' NPK Fertilizer would have been lower, in an amount to be determined at trial.

317. Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq*., may bring an action for damages under W. Va. Code § 47-18-9.").

318. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

319. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business and property in that they paid more for NPK Fertilizer than they otherwise would have paid absent Defendants' unlawful conduct.

320. As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and Class Members seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

**Count 29: Violation of the Wisconsin Antitrust Act,**
**Wis. Stat. § 133.01, *et seq.***

321. Plaintiffs repeat and re-allege every allegation above as set forth above.

322. Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

323. Members of the Class purchased NPK Fertilizer within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

324. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

325. Defendants contracted, combined or conspired in restraint of trade or commerce of NPK Fertilizer, with the intention of injuring or destroying competition, in violation of WIS. STAT. § 133.01, *et seq*.

326. Members of the Class were injured with respect to purchases of Defendants' NPK Fertilizer in Wisconsin in that the actions alleged substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for NPK Fertilizer in Wisconsin.

327. Accordingly, Members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

**VIOLATIONS OF STATE UNFAIR AND TRADE PRACTICES LAWS**

328. Plaintiffs repeat and re-allege every allegation above as set forth above.

329. Defendants engaged in unfair competition and unfair/unconscionable or deceptive acts or practices in violation of the state consumer protection statutes identified below by entering into the combination, conspiracy, or agreement to unreasonably restrain trade in the market for NPK Fertilizer.

330. To the extent deception is required under the state laws below, Defendants concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement to unreasonably restrain trade in the market for NPK Fertilizer.

331. Accordingly, consumers and other indirect purchasers of NPK Fertilizer were induced into purchasing, and will continue to purchase, NPK Fertilizer at inflated prices. Plaintiffs and members of the State Law Damages Class could not reasonably have avoided injury from Defendants' wrongful conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly flows from Defendants' unlawful conduct. Defendants' conduct occurred in connection with consumer transactions related to the availability and sale of NPK Fertilizer.

332. The following Claims for Relief are pleaded under the laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the State Law Damages Class.

**Count 30: Violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.***

333. Plaintiffs repeat and re-allege every allegation above as set forth above.

334. Through the conduct alleged, Defendants have violated ARK. CODE § 4-88-101 *et seq.*

335. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the NPK Fertilizer market, a substantial part of which occurred within Arkansas.

336. Defendants' unlawful conduct substantially affected Arkansas' trade and commerce.

337. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Class concerning Defendants' unlawful activities and artificially inflated prices for NPK Fertilizer. They concealed, suppressed, and omitted facts would have been important to members of the Arkansas Class as they related to the cost of products they purchased.

338. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in NPK Fertilizer by making public statements that were not in accord with the facts.

339. Defendants' statements and conduct related to the price of their products were deceptive as they had the tendency or capacity to mislead members of State Law Damages Class to believe that they were purchasing NPK Fertilizer at prices established by a free and fair market.

340. The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of ARK. CODE § 4-88-107(a)(10).

341. As a direct and proximate result of Defendants' unlawful conduct, members of the State Law Damages Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for NPK Fertilizer due to Defendants' unlawful conduct.

342. Accordingly, members of the State Law Damages Class seek all relief available under the Arkansas Deceptive Trade Practices Act.

**Count 31: Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.***

343. Plaintiffs repeat and re-allege every allegation above as set forth above.

344. CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

345. As alleged throughout this Class Action Complaint, Defendants engaged in unfair, deceptive, and/or unlawful practices in violation of California's Unfair Competition law by, at a minimum making material misrepresentations about the price of NPK Fertilizer.

346. As indicated by statements of California and federal policy, Defendants' grossly excessive and unfair NPK Fertilizer pricing violates public policy and is, as such, unlawful under CAL. BUS. & PROF. CODE § 17200.

347. Defendants' unfair, unlawful and/or deceptive activity alleged caused members of the Class to purchase NPK Fertilizer at inflated prices. Accordingly, members of the Class have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

348. Plaintiffs and members of the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. BUS. & PROF. CODE § 3345; and for such other relief set forth below.

**Count 32: Violation of District of Columbia Consumer Protection Procedures, D.C. Code § 28-3901, *et seq.***

349. Plaintiffs repeat and re-allege every allegation above as set forth above.

350. Members of the Class purchased NPK Fertilizer for personal, family, or household purposes.

351. Through the conduct alleged, Defendants have violated D.C. Code § 28-3901, *et seq*.

352. Defendants are "merchants" within the meaning of D.C. Code § 28- 3901(a)(3).

353. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

354. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

355. Because of the foregoing, Members of the Class are entitled to seek all forms of relief, including treble damages or $1,500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq*.

**Count 33: Violation of Florida's Unfair & Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq.***

356. Plaintiffs repeat and re-allege every allegation above as set forth above.

357. The Florida Deceptive & Unfair Trade Practices Act, FLA. STAT. § 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. § 501.204(1).

358. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

359. A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

360. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. See FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

361. Members of the Class purchased NPK Fertilizer within the State of Florida during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

362. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

363. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property because of overcharges for NPK Fertilizer and are threatened with further injury.

364. Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including injunctive relief pursuant to FLA. STAT. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. § 501.211.

**Count 34: Violation of the Massachusetts Consumer Protection Act,**
**Mass. Gen Laws Ch. 93a § 1, *et seq.***

365. Plaintiffs repeat and re-allege every allegation above as set forth above.

366. Through the conduct alleged, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2, *et seq*.

367. Plaintiffs and Class Members purchased NPK Fertilizer within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth, the price paid would have been lower, in an amount to be determined at trial.

368. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

369. Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

370. Plaintiffs and Class Members purchased NPK Fertilizer, primarily for personal, family, or household purposes.

371. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

372. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under MASS. GEN. LAWS ch. 93A § 9.

**Count 35: Violation of the Missouri Merchandising Practices Act,**
**Mo. Ann. Stat., § 407-010 *et seq.***

373. Plaintiffs repeat and re-allege every allegation above as set forth above.

374. Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") governs unlawful business practices, including antitrust violations such as restraints of trade and

monopolization. MO. REV. STAT. § 407.020 prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and MO. REV. STAT. § 407.025, which provides for the relief sought in this count.

375. The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the State Law Damages Class concerning its unlawful activities and artificially inflated prices for NPK Fertilizer. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the State Law Damages Class as they related to the cost of NPK Fertilizer they purchased.

376. The Defendants misrepresented the real cause of price increases and/or the absence of price reductions in NPK Fertilizer by making public statements that were not in accord with the facts.

377. The Defendants' statements and conduct related to the price of NPK Fertilizer were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the State Law Damages Class to believe that they were purchasing NPK Fertilizer at prices established by a free and fair market.

378. Plaintiffs and Class Members purchased NPK Fertilizer for end use within the State of Missouri during the Class Period. Plaintiffs and Class Members' purchases were made for personal, household, or family use and not for resale. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

379. Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

380. Plaintiffs and Class Members were injured with respect to purchases of NPK Fertilizer in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**Count 36: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970,**
**Mont. Code § 30-14-103 *et seq*. and § 30-14-201 *et seq*.**

381. Plaintiffs repeat and re-allege every allegation above as set forth above.

382. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE, §§ 30-14-103, *et seq*., and 30-14-201, *et seq.*

383. Defendants' unlawful conduct had the following effects: (1) the demand for NPK Fertilizer was artificially increased throughout Montana; (2) Plaintiffs and Class Members were deprived of free and open competition; and (3) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for NPK Fertilizer.

384. Plaintiffs and Class Members purchased NPK Fertilizer, primarily for personal, family, or household purposes. Such purchases were made for end use and not for resale, and qualify as consumer purchases.

385. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

386. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured and are threatened with further injury. Defendants have engaged

in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§ 30 14-103, *et seq*., and 30-14-201, *et seq*., and, accordingly, Plaintiffs and Class Members seek all relief available under that statute.

**Count 37: Violation of the Nebraska Consumer Protection Act,**
**Neb. Rev. Stat. § 59-1602 *et seq*.**

387. Plaintiffs repeat and re-allege every allegation above as set forth above.

388. Through the conduct alleged, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq*.

389. Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609. Defendants' conduct had a direct or indirect impact upon Plaintiff's and Class Members's ability to protect themselves.

390. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

391. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

392. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

393. Because of the foregoing, Plaintiffs and Class Members seek all relief available under the statute, NEB. REV. STAT. § 59-1601, *et seq*.

**Count 38: Violation of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. §598.0903, *et seq*.**

394. Plaintiffs repeat and re-allege every allegation above as set forth above.

395. Through the conduct alleged, Defendants have violated NEV. REV. STAT. § 598.0903, *et seq*.

396. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

397. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

398. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

399. Defendants' conduct was willful.

400. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

401. Because of the foregoing, Plaintiffs and Class Members is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993

**Count 39: Violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. §358-a:1 *et seq.***

402. Plaintiffs repeat and re-allege every allegation above as set forth above.

403. Through the conduct alleged, Defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq*.

404. Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

405. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

406. Defendants' conduct was willful and knowing.

407. Defendants' conduct had a direct or indirect impact upon Plaintiff's and Class Members's ability to protect themselves.

408. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

409. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

410. Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief available under N.H. REV. STAT §§ 358-A:10 and 358-A:10-a.

**Count 40: Violation of the New Mexico Unfair Trade Practices Act,**
**N.M. Stat. Ann. § 57-12-1, *et seq*.**

411. Plaintiffs repeat and re-allege every allegation above as set forth above.

412. Through the conduct alleged, Defendants have violated N.M. STAT. § 57-12-3, *et seq*.

413. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

414. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

415. Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and Class

Members and the price paid by them for Defendants' NPK Fertilizer as set forth in N.M. STAT. § 57-12-2E.

416. Defendants' conduct was willful.

417. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

418. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

**Count 41: Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.***

419. Plaintiffs repeat and re-allege every allegation above as set forth above.

420. Through the conduct alleged, Defendants have violated N.C. GEN. STAT. § 75-1.1, *et seq*. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

421. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

422. Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

423. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

424. Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse

impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

425. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

426. Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

**Count 42: Violation of the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1.1 *et seq.***

427. Plaintiffs repeat and re-allege every allegation above as set forth above.

428. Through the conduct alleged, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq*.

429. Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

430. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

431. Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

432. Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

433. Defendants' conduct was willful.

434. Plaintiffs and Class Members purchased NPK Fertilizer, primarily for personal, family, or household purposes.

435. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

436. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS § 6-13.1-5.

**Count 43: Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.***

437. Plaintiffs repeat and re-allege every allegation above as set forth above.

438. Through the conduct alleged, Defendants have violated S.C. CODE ANN. § 39-5-10, *et seq*.

439. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina. Defendants' conduct had a direct or indirect impact upon Plaintiff's and Class Members's ability to protect themselves.

440. Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

441. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the State Law Damages Class have been injured in their business and property and are threatened with further injury.

442. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE ANN. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the State Law Damages Class seek all relief available under that statute.

**Count 44: Violation of the Vermont Consumer Protection Act, Vt. Stat. Ann. Tit. 9, § 2451, *et seq.***

443. Plaintiffs repeat and re-allege every allegation above as set forth above.

444. Through the conduct alleged, Defendants have violated VT. STAT. ANN. tit. 9, § 2451, *et seq*.

445. Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, among other things, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT. ANN. tit. 9, § 2453(a).

446. Plaintiffs and Class Members purchased NPK Fertilizer within the State of Vermont during the Class Period. But for Defendants' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

447. Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. TIT. 9, § 2465(b); *see* also *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

448. Defendants competed unfairly by restraining trade as set forth, in violation of VT. STAT. tit. 9, § 2453, *et seq*.

449. Defendants' violations of Vermont law were flagrant.

450. Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

451. Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

452. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

453. Plaintiffs and Class Members were injured with respect to purchases of NPK Fertilizer in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**Count 45: Unjust Enrichment**
**(On behalf of the State Law Damages Class)**

454. Plaintiffs repeat and re-allege every allegation above as set forth above.

455. Through their conduct, Defendants caused damages to Plaintiffs and to Class Members.

456. By falsely reporting prices, Defendants artificially increased the demand for their NPK Fertilizer. By purchasing NPK Fertilizer at an inflated price in the United States, which Defendants forced them to do, Plaintiffs and the Class Members conferred a benefit on Defendants in the form of the inflated and unconscionable price of the product.

457. Defendants appreciated the benefit because, were consumers not to purchase NPK Fertilizer, Defendants would have no sales and make no money off NPK Fertilizer sales in the aforementioned states.

458. Plaintiffs and Class Members have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and the artificial increase in the demand of NPK Fertilizer to the economic detriment of Plaintiffs and the Class. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants unconscionable sales, and unlawful acts.

459. Equity cannot in good conscience permit Defendants to be economically enriched for its unjust actions at Plaintiffs and Class Members' expense and in violation of state law, and therefore restitution or disgorgement or both of such economic enrichment is required. It would be futile for Plaintiffs and the Class to seek a remedy from any party with whom they had privity of

contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiffs and the Class.

460. Plaintiffs and the members of the State Law Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the State Law Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the State Law Damages Class may make claims on a pro rata basis.

## IX. DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the proposed Classes, respectfully ask the Court for a judgment that:

461. Certifies the Classes pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Classes, and declares Plaintiffs as representatives of the Classes;

462. Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

463. Enters judgment against Defendants, and in favor of Plaintiffs and the Classes, holding Defendants liable for the antitrust violations alleged;

464. Awards a declaratory judgment that Defendants' price fixing for NPK Fertilizer was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the U.S. market for NPK Fertilizer in violation of the Sherman Act, § 1.

465. Grants permanent injunctive relief:

a. enjoining Defendants from engaging in future anticompetitive conduct with the purpose or effect of preventing actual or potential rivals from gaining a foothold in the Relevant

Market of NPK Fertilizer and eliminating or impairing the price discipline that would come from free and fair competition; and

b. requiring Defendants to take affirmative steps to dissipate the continuing effects of its prior unlawful conduct;

466. Awards Plaintiffs and the Classes actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged, plus interest in accordance with law;

467. Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendant's unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

468. Awards Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees as provided by law;

469. Directs such further relief as it may deem just and proper.

## X. DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 27, 2026.

Respectfully submitted,

*<u>/s/ Rex A. Sharp</u>*
Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
hhepner@midwest-law.com

*Attorneys for Plaintiffs John Weidenaar and Stacy L. Cope as Executrix of the Estate of Jan L. King, and the proposed Classes*